JUSTIN THAYER & another *vs.* EDWIN BURCHARD & others.

A. wrote to B., a common carrier over one of two routes from the West, that he was about to buy grain in the West and wished to hear soon if B. was disposed to contract for its transportation, as he should buy in a different market for B.'s route than for the other. B. in reply stated his rates for carrying flour from the end of a canal to several towns. A. then wrote asking whether the rates applied to grain as well as flour, and whether B. would abate a discrimination in them against A.'s town. B. answered that he would carry A.'s flour and grain from the canal to that town at a given rate "to continue in force till close of navigation unless notice to contrary." A. replied the same day accepting the proposal. *Held,* that to ascertain the terms of the agreement regard was to be had to the whole correspondence, and not the two last letters only. *Held, also,* that, by the terms so ascertained, the relation of the parties was in the nature of an open proposition by B. to which A. might from time to time give effect as a contract by delivering flour and grain and calling for its transportation, and B.'s right to end which by notice was unqualified. *Held, further,* that after giving A. notice of a change of rates to take effect on a certain day, B.'s obligation to carry any of A.'s flour or grain at the former rates after that day was limited to such flour and grain as at the time of the notice had been delivered to B. by A. for transportation. *Held, further,* that such a notice of a change of rates to take effect in twelve days was reasonable without regard to the extent of A.'s purchases in the West, or the location of his flour or grain there purchased, or B.'s information concerning the same.

From the freight house at the station of a railroad corporation, which had agreed with A. to carry his grain over its road at a fixed rate of freight until notice to the contrary, a track extended into the yard of C.'s grain elevator, where C. received and stored the grain at A.'s expense until it was loaded into cars which from time to time the corporation ran into the yard and entrusted to C. to load from the elevator in such proportion as he pleased with grain of A. and of C.'s other customers. *Held,* that delivery at and reception into the elevator, of A.'s grain, accompanied with notice to the corporation that it was there to await transportation under the contract, were equivalent to delivery to and reception by the corporation at the freight house; but that possession by C. of A.'s grain otherwise, or elsewhere than at the elevator, had not such effect.

The rolling stock of a railroad corporation, though sufficient for its ordinary business during nine months of the year, was insufficient to carry promptly all the freight of a particular kind, requiring peculiar cars, in three months of a year in which it had made a special contract with a person to transport his freight of that kind without specifying any quantity to be transported or limiting any time for the performance of the service. During intervals in those months between days when he delivered freight to the corporation under the contract and the days when it was loaded on the cars by his storekeeper, into whose yard the corporation sent cars to be loaded at the storekeeper's discretion, he incurred expenses for storage and insurance on that freight. The cars sent to the storekeeper were more than sufficient to have carried all that freight alone so promptly as to have avoided such expenses; but the storekeeper loaded them with it only proportionally with similar freight of his other customers likewise awaiting transportation but with whom the corporation had no special contract. *Held,* that the fact that in those three months every year there was a great accumulation of such freight for transportation over the road was insufficient to render the corporation liable for those expenses on the ground of negligence in its equipment.

CONTRACT by the firm of Thayer & Sergeant, grain dealers at Northampton, against the trustees of the bondholders of the Rutland and Burlington Railroad, in the use and occupation of that road as common carriers, to recover a portion of the price paid to them by the plaintiffs, under protest, for the transportation of grain from Schenectady in New York over the Rensselaer and Saratoga, Rutland and Burlington, Vermont Valley, Vermont and Massachusetts and Connecticut River Railroads, to Northampton and other places in Massachusetts on the line of the road last named; and for insurance and storage of grain and other expenses incurred by the plaintiffs, after October 1, 1866, in consequence of the defendants' delay to transport grain for the plaintiffs from Schenectady over that route before that date.   In the superior court facts were agreed in substance as follows :

On June 22, 1866, the plaintiffs wrote from Northampton to Henry E. Chamberlin, the general freight agent of the defendants, that in the autumn they should have a large quantity of grain to come forward; that they wished to be in a position to ship " either way," by Buffalo or by Ogdensburg; and that, as they were about purchasing for future delivery, they would like to hear from the defendants at an early day, " if disposed to contract," as they should buy in a different market for the defendants' route than for the route by way of Ogdensburg.   The next day, June 23, Chamberlin replied, offering to the plaintiffs " the same rates for flour as we gave other parties," specifying those rates per barrel from Schenectady to five places on the Connecticut River Railroad, in which specification a higher rate was charged for transportation to Northampton than to Chicopee or Springfield, and asking for advice if these rates should be satisfactory.   The plaintiffs answered, June 26, stating that they supposed that the defendants intended to include grain " in car lots," although their letter of the 23d did not so state; that if the defendants would allow them the same privilege as to shipping which others took, it would be all that they asked, which was, to bill to Springfield grain designed for Northampton; that the " elevating charges " were more at Schenectady than at

Albany, but at the defendants' Springfield rate the plaintiffs would ship over the defendants' route "what comes by canal;" and asking advice "whether tariff sent includes grain, and whether you will allow us to bill to Springfield." Chamberlin replied, June 30: "We will take your flour and grain, in full car loads of not less than ten tons, Schenectady to Northampton, for four dollars per ton. This rate to continue in force until close of navigation, unless notice to the contrary. If accepted, please advise me at once." On the same day the plaintiffs answered: "We are in receipt of your favor of even date, offering to transport our flour and grain in car loads not less than ten tons, Schenectady to Northampton, for four dollars per ton till close of navigation, unless we are notified to the contrary. We accept the proposition." The receipt of this acceptance was acknowledged by the defendants on July 5.

At the terminus of the Rensselaer and Saratoga Railroad in Schenectady the firm of Maxon & Co. kept a grain elevator, and the railroad "had a freight house in no way connected with said elevator except by a track over which the railroad company passed their cars into the yard of Maxon & Co., where they were taken by Maxon & Co. into their elevator, and loaded with grain by Maxon & Co. without special directions from the railroad company as to whose grain should be loaded in them." All the grain in controversy in this action was consigned from the West, by way of Buffalo and the Erie Canal, to "Thayer & Sergeant, Northampton, care of Maxon & Co., Schenectady," who "were the agents of the plaintiffs, as well as of very many other shippers over this line, and owned and controlled the elevator, and were charged with the duty of loading the cars when furnished by the defendants;" and "it was known to the plaintiffs that Maxon & Co. would only forward to them *pro rata* with their other customers, and was also known to the defendants that it was the custom of Maxon & Co. to forward grain to all their customers, and not to one customer to the exclusion of others."

The first boat load of grain which arrived at Schenectady for the plaintiffs was taken by Maxon & Co. into the elevator on

August 28; the second on August 29; the third and fourth on September 17; the fifth on September 20; the sixth on September 21; and the seventh on September 22; and "said three last named boat loads arrived at Schenectady at some time prior to the respective dates when they were thus taken into the elevator, but not more than three days prior to said respective dates." The average quantity of grain to the boat load was about 8000 bushels. On September 10, there were also taken into the elevator for the plaintiffs upwards of 6000 bushels not included in the boat loads. "The capacity of the elevator was about 150,000 bushels, and when the first cargo for the plaintiffs arrived at Schenectady the elevator was from one third to one half filled with grain, and it continued gradually to increase until it became filled about September 17."

The following correspondence occurred between the parties subsequently to entering into the contract; and was submitted as part of the agreed facts, "subject to its legal effect, — its relevancy and competency to be determined by the court," it being conceded, however, "that the defendants were informed by the plaintiffs that all the grain in controversy had arrived at Schenectady on September 18, or very near then, as appears by the correspondence."

On September 5, the plaintiffs wrote to Chamberlin: "We have 16,000 bushels corn already at the elevator. The same amount leaves Buffalo to day, due there say ten days hence We wish it forwarded at the earliest moment. And we have 24,000 bushels now afloat on Lake Erie for same point. In all, some 66,000 to 70,000 bushels grain. Maxon informs us he is short of cars. Will you do what you can to help it along? We rely on your help to get it forward. Please let us hear what the prospect is." On September 15, they wrote again: "We have no reply to ours of September 5 about cars. Maxon writes us that your road do not furnish their proportion. Our second 16,000 bushels is due there to-day, and we wish to push it forward as soon as possible. With the 24,000 more now on the canal, which will arrive next week, we can furnish occupation for all the cars you can furnish for some time to come.

Please see what you can do for us, and write to us what to expect." On September 17, Chamberlin replied: "We are very short of cars. Customers from all points are calling for them daily. I am doing, and will continue to do, all I can to accommodate you;" and asked if the plaintiffs could not induce the Connecticut River Railroad to forward grain cars to Schenec-tady. The next day, September 18, Chamberlin wrote to the plaintiffs: "On and after October 1 next, rate for grain in car loads from Schenectady to all points on Connecticut River Railroad will be twenty-eight cents per 100 lbs." The plaintiffs, on September 19, acknowledged receipt of Chamberlin's letter of the 17th, and wrote in reference to it: "Our customers are urging us daily for the grain, which is ready for you. We will do all we can to assist you in the matter of cars, and see that they are promptly discharged;" and they added: "We have also yours of the 18th, advising us of an advance of rates October 1. Our grain is ready for shipment, and we shall depend on its being got forward previous to that date." On October 6, they wrote to Chamberlin again: "We notice that all grain coming forward since October 1 is waybilled at twenty-eight cents per hundred. As this will only make the roads a world of trouble in correcting accounts, we write to ask you to instruct railroad agent at Schenectady to bill at contract prices, to save so much altering bills. He probably is not aware of the contract. Please also have him send corrected freight bills for what has already gone forward. All our grain there was bought, sold and shipped previous to your notice." On October 19, they again wrote: "We have no reply to ours of October 6 requesting you to alter freight bills on the grain contracted at twenty cents per 100 lbs. Please advise us what course to pursue in the matter. We saw Mr. Phelps of Connecticut River Railroad a few days since. He understands the matter as you do, that the grain in before your advance went into effect is on the old contract price of twenty cents per 100 lbs.; still all the bills come charged at twenty-eight." Chamberlin answered, October 22: "I do not think that you have any legal claim upon us to freight any grain at twenty cents per hundred after October 1. Still, so far as

this road is concerned, we should be willing to take all grain and flour you had at Schenectady awaiting shipment at the time notice of advance in rates was given (September 18) at the price then in force. Freight record at Schenectady subsequent to the notice should be subject to the advance after October 1. Mr. Marcy, of Rensselaer and Saratoga Railroad, is opposed to taking any grain whatever at four dollars since October 1. If you will give me statement showing amount on hand at Schenectady September 18, and the balance of that amount left over October 1, I will endeavor to get deduction made." The plaintiffs answered, October 29, that they had no doubt of their "legal as well as moral claim to the carrying out of the freight contract," but wished to avoid litigation; that they inclosed Maxon & Co.'s statement of the amount of grain in their hands September 17, and the amount shipped from September 17 to October 1, "leaving balance in their hands October 1, subject to contract rate of twenty cents per 100 lbs.," of 43,877 bushels; and added: "Mr. Maxon informs us that, had cars been provided, he could and would have loaded the grain previous to October 1. He also informs us that Mr. Marcy informed him that, in case you had contracted with us, he was disposed to carry out the contract, but understood from you that no such contract existed. We think he must have misunderstood you, and refer you to your letter to us dated June 30." Chamberlin replied, November 2: "It seems to me that we stand in the same relation to you that we do to all other parties having freight to ship from Schenectady at the time the advance was made. Your contract expired, by notice, October 1. By your interpretation, you would oblige us to take your grain all winter at four dollars, if you could get sufficient quantity at Schenectady, before 'close of navigation,' to keep us running. I was disposed to take all grain that you had at Schenectady at the time of notice, September 18, at the contract rate, and did everything I could to furnish cars for you to get it away before October 1. I sent your letter of the 29th to Mr. Marcy of the Rensselaer and Saratoga Railroad, and he writes, ' In this case the grain is not delivered to us until loaded into our cars We

decline to take any they have there at less than tariff rates. You see there is no ' misunderstanding.' I am unable to make any deduction from tariff rates on shipments since October 1." The correspondence closed with a letter from the plaintiffs to Chamberlin, without date, as follows: " We are in receipt of your favor of November 2, in which you decline to take our grain which was at Schenectady awaiting shipment at the time your advance in freights, October 1, went into effect, at less than twenty-eight cents per 100 lbs., which grain being contracted at twenty cents per 100 pounds, we shall pay the freight bills as charged, reserving our rights under the contract we hold with you, and wish it distinctly understood that in so paying them we do not waive our claim to have the grain transported at contract rates, viz : twenty cents per hundred pounds, for the amount that was ready for transportation at the time the advanced rates went into effect."

It was further agreed that of the plaintiffs' grain received at the elevator before October 1, as above enumerated, fifteen car loads, comprising one hundred and fifty-three tons, were forwarded from Schenectady to the plaintiffs before September 18 ; and twenty-six car loads, comprising two hundred and seventy-eight tons, between September 18 and October 1 ; leaving upwards of twelve hundred and ten tons of their grain in the elevator on October 1, of which, after that date, and mostly before December 1, eight hundred and twenty-eight tons were forwarded to them at Northampton and the rest to other places on the line of the Connecticut River Railroad, the price of twenty-eight cents per 100 lbs. being charged by the defendants on all of it, and paid by the plaintiffs under protest, the difference between the rate thus paid by them and the rate of twenty cents per 100 lbs. on the twelve hundred and ten and more tons being $1936.08, and the amount paid by them to Maxon & Co for storage of the grain after October 1 being $479.09, and for insurance thereon, $222.36 ; all of which three sums the plaintiffs contended that they were entitled to recover. And finally it was agreed that " the line had many more than sufficient cars to have transported the grain in question between September 18

and October 1, had they been devoted to that service alone; that from forty to fifty cars in constant service would have been sufficient to transport said grain between those dates; that from September 1 to October 1 the defendants sent to Maxon & Co. two hundred and nineteen cars to be loaded, without any instructions as to whose grain should be put in them; that there were about one hundred and twenty-five car loads of the plaintiffs' grain in all delivered at the elevator during said period; that the defendants did not know the actual amount of grain remaining in the elevator at the date of the notice, not knowing how much had then been forwarded, and took no pains to inform themselves on that subject; that the defendants had no written or special contracts with any of their customers, except the alleged contract in question with these plaintiffs; that the same rates for freight were charged to all the customers of the defendants which were charged to the plaintiffs under their alleged contract prior to October 1, and at that date the advance in the defendants' charges for freight applied as well to all their customers as to these plaintiffs; that a larger proportion of cars according to the tonnage was devoted to the grain business than to any other branch of business carried on by the defendants during said fall and winter of 1866, but not a larger proportion than is usually devoted to that business in the grain seasons; and that the defendants and said connecting roads had a sufficient equipment for their ordinary business, except during the months of September, October and November, prior to the close of navigation, when there is an unusual amount of business, requiring for its prompt performance a larger number of cars than is required for the ordinary business of said roads."

Judgment was ordered for the defendants; and the plaintiffs appealed.

*C. Delano*, for the plaintiffs. 1. As the contract grows out of a correspondence, all the letters which throw light upon the subject matter and intention of the parties are admissible to aid in its construction. Chit. Con. (10th Am. ed.) 88. *Nash* v. *Towne*, 5 Wallace, 689, 699. *Sumner* v. *Williams*, 8 Mass. 214. *Stover* v. *Metzgar*, 1 W. & S. 269. *Mactier* v. *Frith*, 6 Wend. 103.

*Fowle* v. *Bigelow*, 10 Mass. 379. *Cunningham* v. *Parks*, 97 Mass. 172.

2. When, therefore, the defendants contracted to carry flour and grain for the plaintiffs from Schenectady to the places on the line of the Connecticut River Railroad, in car loads of not less than ten tons, at four dollars per ton, till the close of navigation, " unless notice to the contrary," they did so in full view of the change of situation it involved to the plaintiffs, (a change of market as well as of route and means of transportation, and the inevitable accumulation of large quantities of grain at Schenectady,) and by " notice to the contrary " they must have been understood to intend a reasonable notice, which would seasonably warn the plaintiffs against any further shipments of grain to Schenectady. Chit. Con. (10th Am. ed.) 79, 801. *Adams* v. *Foster*, 5 Cush. 156. *Spooner* v. *Baxter*, 16 Pick. 409. *Graddon* v. *Price*, 2 C. & P. 610. *Brighty* v. *Norton*, 3 Best & Smith, 305. *Baker* v. *Mair*, 12 Mass. 121. *Atwood* v. *Emery*, 1 C. B. (N. S.) 110. The ordinary rule that a deed or other instrument shall be taken most strongly against the grantor or contractor calls for such a construction. Chit. Con. (10th Am. ed.) 99. *Barney* v. *Newcomb*, 9 Cush. 56. *Mayer* v. *Isaac*, 6 M. & W. 612. The defendants, having by their offer so induced the plaintiffs to change their situation, were equitably estopped to increase the rates of freight on grain *in transitu*. *Dewey* v. *Bordwell*, 9 Wend. 65. On the defendants' construction of the contract, it would have been competent for them, even when the first boat loads were arriving, to abruptly terminate the contract, and exact the highest rates; which would have been a fraud differing only in degree from that which they did actually commit. They also acted unreasonably in giving their notice, in that they took no pains to inform themselves of the amount of grain in the elevator at the time, or of their ability to move it before the notice would take effect.

3. Assuming then that a reasonable notice would require the defendants to carry at contract rates all the grain that had arrived or was arriving at the date of the notice, a reference to the greed facts, as well as to the plaintiffs' letter of October 29

called for by the defendants' letter of October 22, shows that of the plaintiffs' grain in Maxon & Co.'s hands on September 17 there remained after October 1 a balance of 43,877 bushels, on which the defendants charged the excessive eight cents per hundred lbs.

4. The defendants, whether in virtue of their common law liability as common carriers, or their liability under their contract, were bound to carry with reasonable diligence; and they distinctly admit that, though they knew that in the months of September, October and November, there was an unusual amount of business, requiring for its prompt performance a larger number of cars than for other months, yet they did not provide an equipment sufficient for the exigencies of those months. They are liable therefore for the extra charges for storage and insurance. *Taylor* v. *Great Northern Railway Co.* Law Rep. 1 C. P. 385. Hand, J., dissenting, in *Wibert* v. *New York & Erie Railroad Co.* 2 Kernan, 257.

*S. T. Spaulding*, for the defendants.

WELLS, J.[*] This action is founded upon an agreement relating to rates of freight, for transportation of flour and grain over a line of connecting roads. The agreement was effected by means of correspondence. The defendants contend that the terms of the agreement are to be sought only in the final letter of each party, in which the negotiation terminated by a certain proposition made and accepted; that the previous letters are merely preliminary, and, not being referred to in the final proposition, form no part of the contract which resulted from the correspondence, and therefore cannot be used to enlarge or explain its meaning and application.

If the correspondence had been followed by a formal written agreement, covering the whole subject matter, complete in itself and unambiguous in its terms, the position of the defendants might be correct. But that is clearly not the case here. Although the defendants' letter of June 30 does not expressly refer to the previous correspondence, it is manifestly based upon it,

---

[*] FOSTER, J., did not sit in this case.

and requires its aid to give full significance to the letter itself. The correspondence is continuous and consecutive in its relation to the subject, and in legal contemplation is contemporaneous; as much so certainly as verbal negotiations begun in the morning and resumed and completed at evening. *Cunningham* v. *Parks*, 97 Mass. 172.

Taking the correspondence together, it is apparent that the expression " We will take your flour and grain " refers to the flour and grain purchased and to be purchased by the plaintiffs for transportation to various points on the Connecticut River Railroad, and to be delivered to the defendants at Schenectady, by way of the Erie Canal or the New York Central Railroad. It is evident also that the proposition to deliver at Northampton was not intended to be exclusive of the other points upon the Connecticut River Railroad which had been mentioned in their previous letter of June 23. In that previous letter the defendants had made a discrimination against Northampton, as compared with the other places mentioned. The plaintiffs' letter of June 26 is devoted mainly to the discussion of that difference. The special mention of Northampton in the defendants' letter of June 30 indicates that the defendants conceded that point, and made the rate for Northampton correspond with that for the other places, and thus to represent the whole in the proposition which they made and which the plaintiffs accepted.

The contract relates only to the rates of freight. It does not import any other change in the relations of the parties. It does not impose any additional duty upon the defendants, to receive and transport without delay the plaintiffs' goods, than they were already under as public carriers. Neither does it apply to any definite amount of business or quantity of goods to be so transported. The plaintiffs did not, by their acceptance of the terms, engage to furnish goods for transportation. Although they should purchase goods for that purpose, they might, at any time before their delivery at Schenectady and notice to the defendants to transport them, divert them to another route. Until such delivery and notice, there was no mutuality of obligation. The matter stood, in this respect, as upon an open

proposition by the defendants, which the plaintiffs might make operative as a contract by delivering goods and calling for their transportation. To extend the obligation of the defendants beyond that limit would leave it, as it seems to us, without limit and without mutuality.

It is contended that the information that the plaintiffs would be governed, in their purchases at the West, by the result of these negotiations, made it incumbent upon the defendants to transport all goods at the agreed rate, which had been purchased with a view to such transportation; or at least all that were actually *in transitu* before notice of a change of rate. But the contract makes no such proviso. Nor does it even provide that all goods arrived at Schenectady, when such notice is given, shall be carried at that rate. No length of notice is stipulated for, and no reservation in favor of goods ready for transportation at the time of such notice. The absence of any such express proviso is significant against the construction contended for. Aside from express agreements, a carrier may always charge a reasonable compensation for every service performed. He may refuse to receive goods for transportation unless such reasonable compensation be paid. Goods received and transported must be carried at the customary rates previously charged, because the parties will be presumed to have contracted with reference to those rates, until notice of a change is given, either public or personal. *Fitchburg Railroad Co.* v. *Gage,* 12 Gray, 393

In this case, the notice given was reasonable, and all that was required by the terms of the contract. The only question is, whether the transactions between the parties, previous to the notice, were such as to make that contract attach to any particular quantity of goods, so that the obligation of the defendants became absolute to transport them at the agreed rate notwithstanding notice of an advance of rates.

The course of business between the parties was this: The plaintiffs' grain, on arrival at Schenectady, was transferred and received into the elevator of Maxon & Co., where it remained on storage until loaded directly from the elevator into the cars by which it was to be transported to the plaintiffs. For this

purpose a track was laid from the freight house of the Rensselaer and Saratoga Railroad (which road formed part of the line in whose behalf the contract was made) into the yard of Maxon & Co. When cars were furnished for this transportation, they were run by this track into the yard of Maxon & Co., and by them taken into the elevator and loaded. Maxon & Co. performed the same service for other parties, as well as for the plaintiffs ; and the order in which the grain of their several customers should be forwarded was determined by them, and not by the railroad company. This arrangement relieved the railroad company from the necessity of making extensive provisions for transferring freight, and storing it while delayed for want of cars, and imposed the expense of storage upon the owners. But we think that the arrangement was so far a substitution of the elevator of Maxon & Co. for freight houses of its own, that, under an express contract for the carriage of goods at a fixed rate until notice to the contrary, a delivery of grain at and its transfer into the elevator, accompanied by notice from the owner that it was so delivered and stored, in readiness and for the purpose of being transported upon the terms of the contract, were equivalent to a delivery to and acceptance by the railroad company itself, at its own freight house. After the goods had been so received, it was too late, as to those goods, to give notice of an increase of rates. The contract for transportation at four dollars per ton attached to them, notwithstanding its termination for all other purposes, before they were actually carried over the road. But the plaintiffs could not, after such notice and before the time fixed for the advance of rates, proceed to accumulate grain at the elevator beyond the capacity of the railroad to receive and transport, and require that all grain so accumulated before October 1 should be transported at the same rate after that time.

Upon the question of liability on the ground of delay, it does not appear from the agreed facts that the defendants were in fault, either in respect to the proper equipment of their roads, or their facilities for doing the ordinary business of that route ; or in the manner in which they applied such means as they had to

the performance of the extraordinary amount of service which was pressing upon them at that season. They were not bound by their contract, nor would they have been justified by their duties as public carriers, to have devoted all their cars, or an undue proportion of them, to the carriage of the plaintiffs' grain by the exclusion of others. And besides, the disposition of the cars which they were able to furnish was not made by them, but controlled by Maxon & Co., who were agents of the plaintiffs in that respect. For losses, expenses, or other damage arising from mere delay, occasioned by a temporary excess of business, and without fault, the carrier is not responsible. *Wibert* v. *New York & Erie Railroad Co.* 2 Kernan, 245. *Parsons* v. *Hardy*, 14 Wend. 216. *Taylor* v. *Great Northern Railway Co.* Law Rep. 1 C. P. 385.

The plaintiffs are entitled to recover the amount paid by them in excess of the rate of four dollars per ton, for all grain which had been received at the elevator and transferred into the possession and control of Maxon & Co. for the purpose of transshipment upon the defendants' line of railroad, before notice was given of the proposed change of rates. The agreed facts do not enable this court to determine for what amount judgment should be rendered, upon the principles above stated. This must be ascertained in the superior court in such manner as that court shall direct; and thereupon judgment is to be entered according to the result. As there is apparently something due to the plaintiffs,

> *The judgment for the defendants in the superior court must be set aside.*

After the foregoing decision, the case was submitted, in the superior court, by agreement of the parties, to *Scudder*, J., without a jury, to determine the amount for which the plaintiffs were entitled to judgment; and he made the following report:

"It appears that at the date of the notice of September 18 there were actually in the elevator of Maxon & Co., at Schenectady, five hundred and forty-two tons of corn on which the plaintiffs are entitled to recover an overcharge of one dollar and

sixty cents per ton, with interest from the date of the plaintiffs' writ, no prior date of payment or demand having been proved or agreed upon; in all, the sum of $978.49. The plaintiffs further claimed to recover at the same rate on three boat loads of corn, containing two hundred and twenty tons each, which they contended had been shipped, and were on the way, or had arrived at Schenectady, before the notice of September 18 had been given, but which had not been actually taken into the elevator of Maxon & Co.; and upon this claim they offered testimony, which was objected to by the defendants as irrelevant and inadmissible, but which was taken, at the request of the plaintiffs, subject to the opinion of the court as to its admissibility and effect." The report then recited the testimony in full, and continued: " Upon this testimony the court find that neither of said three boat loads had been received at the elevator of Maxon & Co., and transferred into their possession and control for the purpose of transshipment on the defendants' line of railroad before notice was given of the proposed change of rates; and that the plaintiffs are not entitled to recover the overcharge claimed upon the cargoes of said boats or any one thereof. The court accordingly find that the plaintiffs are only entitled to recover of the defendants the sum of $978.49 before stated, and for that sum the plaintiffs are entitled to judgment."

Part of the testimony of the plaintiff Sergeant recited in the report was to the effect that he did not know whether the defendants' notice of the increase in the rates of freight was received by the plaintiffs on September 18 or September 19, but he thought it was received on September 19 about six o'clock in the afternoon. There was also testimony of a member of the firm of Maxon & Co. that they received from Buffalo the bills of lading of the three boat loads not later than September 13, and their usage was to hold cargoes for their charges and back-charges; that the three loads were taken into the elevator on September 20, 21 and 22; that they paid no charges on these cargoes till taken into the elevator; and that " by paying the back-charges the plaintiffs could have placed these boat loads wherever they pleased." And further, there was testimony of

the captain of the Anan Harmon, one of the three boats, that he arrived at Schenectady, with his boat, on the evening of September 18, and on the morning of the 19th gave Maxon & Co. notice of his arrival.

A bill of exceptions, preferred by the plaintiffs and allowed by the judge, set forth this report, and was in substance as follows:

" In addition to the testimony recited, the plaintiffs relied on the evidence contained in the agreed statement of facts and letters used at the former hearing before the supreme judicial court, and also offered evidence tending to show that the three boat loads of corn referred to in said agreed statement as having been put into the elevator on the 20th, 21st and 22d of September were the same 24,000 bushels referred to in the plaintiffs' letter of September 5 as " afloat on Lake Erie," and again referred to in their letter of September 15 to which the defendants' letter of September 17 was in response. The plaintiffs contended that if the court should be satisfied that these three boat loads, or one or more of them, had been shipped from Buffalo to Maxon & Co., who held the bills of lading as security for their own as well as for back-charges, having a lien on the cargoes therefor, then in law they were so far within the custody and control of Maxon & Co., as agents of the plaintiffs, and also, for certain purposes, of the defendants, that the notice of September 18 would not relieve the defendants from carrying at the lower rate whatever had been so shipped, even though not put in the elevator at the date of the notice. The plaintiffs also relied on the letters above specified, and all the other letters contained in said agreed statement, and insisted that the defendants, by not declining to carry at the lower rate when first advised that the 24,000 bushels were *in transitu* for Schenectady, were estopped afterwards to give a notice which would take this corn out of the contract price. The plaintiffs also offered to show that, relying on the defendants' agreement to carry at the lower rate, they had, before receiving said notice, made contracts to deliver the greater part of said grain to different customers along the line of connecting roads covered by the defend-

ants' contract, and contended that the grain so contracted for
was not subject to the higher rates.   The plaintiffs also asked
the court to rule that, if the Anan Harmon arrived at Schenec-
tady on the evening of September 18, and the defendants' notice
of the 18th was not received by the plaintiffs till after business
hours on that day, that boat load would not be subject to the
advanced rates.   But the court, in view of the opinion of the
supreme judicial court already delivered in the case, declined to
treat or regard any portion of the three boat loads above men-
tioned as subject to the lower rates of contract, and assessed the
damages at the amount stated in said report."

These exceptions were argued at September term 1869 by the
same counsel.

WELLS, J.   The rulings of the superior court appear to us to
be in precise accordance with the decision previously made in
this case.   The contract between these parties gave the defend-
ants an unqualified right to terminate it by notice.   No length
of notice was stipulated for, and no reservation in favor of grain
about to arrive.   The plaintiffs could not, by their own arrange-
ments of business, or by their contracts with other parties, re-
strict this right of the defendants; nor could they, by informing
the defendants of their arrangements and expectations in regard
to the receipt of freight over the canal, modify that right, or im-
pose upon the defendants any different obligation from that
which their contract expressed.

The ground on which grain already received at the elevator
of Maxon & Co., with notice to the defendants that it was there
for transportation, was held not to be subject to the increased
rates, was, that such receipt and notice were equivalent to a de-
livery to the defendants for that purpose.   By their arrange-
ments and mode of use, the defendants had made the elevator of
Maxon & Co. a sort of substitute for warehouses of their own.
It was the fact that the grain was there stored and awaiting the
convenience of the defendants to transport it, which deprived
the defendants of the right to affect such grain by notice of a
change of rates.   Any rights which Maxon & Co. might ac-
quire in or to the property by contract with the plaintiffs, or by

virtue of charges or advances made upon it, would have no bearing upon the question. Constructive possession by them, as consignees, could in no way affect these defendants. Actual possession by them, otherwise or elsewhere than at their elevator, would be ineffectual to modify the obligations of the defendants in respect to its transportation. Actual delivery of the grain at a place designated or assented to by the defendants for the purpose, with a request for its transportation, was such an offer of freight under the contract as required its transportation upon the terms of that contract, and made a notice of change of rates then too late. But, until such delivery and request, the obligation of the defendants could not be made absolute by any contracts or arrangements of the plaintiffs with other parties.

Upon the facts reported, and the findings of the superior court thereon, it is to be taken as conclusively established that no one of the boat loads, about which the controversy is now pending, had been so delivered and received before the receipt of notice of the change of rates. *The exceptions are therefore overruled.*