## INDIANAPOLIS AND ST. LOUIS RAILROAD COMPANY*

### v.

### WILLIAM JUNTGEN.

1. COMMON CARRIER OF CATTLE—DELAY IN DELIVERY—OVERPOWERED BY RIOTERS.—A common carrier is only required to exercise due care and diligence to guard against delay, and where its servants are overpowered by a mob and prevented from forwarding its trains, it will not be held responsible for the delay, provided it omits no reasonable effort to secure the property in course of transportation.

2. RESPONSIBILITY OF COMPANY FOR ACT OF MOB.—For a delay occasioned by a refusal of the company's servants to do their duty, the company is responsible; but for a delay resulting solely from the lawless violence of men not in its employ, the company is not responsible.

APPEAL from the Circuit Court of Edgar county; the Hon. J. W. WILKIN, Judge, presiding. Opinion filed February 3, 1882.

Mr. C. V. JAQUITH and Mr. JOHN T. DYE, for appellant; that in the absence of a special contract, the company is liable only to the extent of its own line, cited R. R. Co. v. Mfg. Co. 16 Wall. 318; R. R. Co. v. Pratt, 22 Wall. 123; Darling v. R. R. Co. 11 Allen 295; Nutting v. R. R. Co. 1 Gray, 502; Burrows v. R. R. Co. 100 Mass. 26; R. R. Co. v. Berry, 68 Pa. St. 272; Root v. R. R. Co. 45 N. Y. 524; Babcock v. R. R. Co. 49 N. Y. 491; Converse v. Trans. Co. 33 Conn. 166; Perkins v. R. R. Co. 47 Me. 573; Bank v. Trans. Co. 23 Vt. 209; Buntnall v. R. R. Co. 32 Vt. 673; Ex. Co. v. Rush, 24 Ind. 403; McMillan v. R. R. Co. 10 Mich. 219; Hoagland v. R. R. Co. 39 Mo. 451; Coates v. Ex. Co. 45 Mo. 238; Stewart v. T. H. & I. R. R. Co. 5 Fed. Rep. 3.

* And two other cases.

What the contract between the shipper and carrier is, is a matter of evidence: Erie R'y Co. v. Wilcox, 84 Ill. 229.

The carrier may limit his liability by express contract: Erie R'y Co. v. Wilcox, 84 Ill. 239; U. S. Ex. Co. v. Haines, 67 Ill. 137; C. & N. W. R. R. Co. v. Montfort, 60 Ill. 175; Lawson on Carriers, § 236.

Where some parts of a contract are good, and others bad, the good may be enforced if there is no imputation of *malum in se:* Gelpcke v. Dubuque, 1 Wall. 222; U. S. v. Bradley, 10 Pet. 360.

The company is not responsible for damages resulting from the lawless acts of a mob: Taylor v. R'y Co. L. Rep. 1; Parsons v. Hardy, 14 Wend. 216; G. & C. R. R. Co. v. Rae, 18 Ill. 488; Wibert v. R. R. Co. 2 Kernan, 251; Thayer v. Burchan, 99 Mass. 521; M. C. R. R. Co. v. Burrows, 33 Mich. 6.

Mr. ANTHONY THORNTON, for appellees; that where goods are received as through freight, the company is liable beyond its terminus, cited Adams Ex. Co. v. Wilson, 81 Ill. 339; T. P. & W. R. R. Co. v. Merriman, 52 Ill. 123; Ill. Cent. R. R. Co. v. Frankenburg, 54 Ill. 88; C. & N. W. R. R. Co. v. Montfort, 60 Ill. 175; Ill. Cent. R. R. Co. v. Copeland, 24 Ill. 332; M. & St. P. R. R. Co. v. Smith, 74 Ill. 197.

Even in the case of an express contract the carrier is liable for negligence: Field v. C. & R. I. R. R. Co. 71 Ill. 458; Erie & W. T. Co. v. Dater, 91 Ill. 195; Boscowitz v. Adams Ex. Co. 93 Ill. 523.

The company is liable for loss occasioned by unreasonable delay in the transportation of cattle: Ill. Cent. R. R. Co. v. Frankenburg, 54 Ill. 88; C. & N. W. R. R. Co. v. N. L. P. Co. 70 Ill. 217; I. & St. L. R. R. Co. v. Herndon, 81 Ill. 143; Ill. Cent. R. R. Co. v. Waters, 41 Ill. 73; St. L. & S. E. R. R. Co. v. Dorman, 72 Ill. 504; K. P. R. R. Co. v. Nichols, 9 Kan. 235.

The carrier is excused only by uncontrollable circumstances: O. & M. R. R. Co. v. Dunbar, 20 Ill. 623; Ill. Cent. R. R. Co. v. McClellan, 54 Ill. 58; Ill. Cent. R. R. Co. v. Cobb, 64 Ill. 128; T. W. & W. R. R. Co. v. Lockart, 71 Ill. 627; T. W. &

W. R. R. Co. v. Hamilton, 76 Ill. 393; Forward v. Pittan, 1 Teun. R. 24; C. & N. W. R. R. Co. v. Sawyer, 69 Ill. 285; Mer. Des. Co. v. Kahn, 76 Ill. 520; Redfield on Carriers, § 25; Colt v. McMechen, 6 Johns. 166; Lawson on Carriers, § 13; Greenleaf's Ev. 219.

Common carriers can not claim immunity from damages resulting from the misconduct of their employes: P. Ft. W. & C. R. R. Co. v. Hazen, 84 Ill. 36; Blackstock v. N. Y. & E. R. R. Co. 20 N. Y. 48.

McCulloch, J. These three cases were argued together, and are so nearly alike that one opinion will answer for all. Appellant was sued by each one of the appellees for damages resulting from a wrongful delay in transporting certain cattle from certain points in Edgar county, Illinois, to the city of Buffalo, in the State of New York. and for improper treatment on the way, whereby they became depreciated in value. Juntgen made his shipment at Kansas Station, and took from the company a receipt or contract which purported to limit appellant's liability to its own line, which terminated at Indianapolis, in the State of Indiana. Bridgman & Rose, and also Caldwell, shipped from Mattoon by a verbal undertaking. It is contended, on the part of the several appellees, that their shipping contracts were for the whole distance from the several points of shipment to the point of destination, whereas appellant contends that its responsibility was to cease at the termination of its own line. In the view we take of the case, it is unnecessary for us to determine this question; and if the cause shall be again tried it will depend upon the evidence then introduced as to whether or not the cattle were shipped on through contracts. Appellant claims that Juntgen made his shipment by a written contract signed by himself, as well as by the agent of appellant, as follows:

"FREIGHT OFFICE INDIANAPOLIS & ST. LOUIS R. R. Co.

STATION, KANSAS, July 20, 1877.

" Received of William Juntgen five cars cattle to be delivered at Indianapolis Station at special rates, being $20 per car, in consideration of which and for other valuable considera-

tions, it is hereby mutually agreed that said company shall not be liable for loss by jumping from the cars, delay of trains or any damages said property may sustain, except such as may result from a collision of a train, or when cars are thrown from the track in course of transportation, to be fed and taken care of by the owner.

(Signed.)

GEORGE SEFTON, Agent.

WILLIAM JUNTGEN, Shipper."

By which it is claimed he became bound, although appellant could not have so limited its liability by a simple receipt. Should this claim be well founded, it would still remain to be proved on the trial that the cattle in question were shipped by this contract, and that its terms were knowingly assented to by Juntgen.

The cattle in question in each one of these suits went forward by the same train, which had proceeded on its way as far as Collingwood near the city of Cleveland, when, as claimed by appellant, it was stopped by a body of strikers, and by an overpowering force, beyond the power of the railroad then having charge of the cattle, to control, and there detained for several days. During this interval it became necessary to unload the cattle for food and water, and there being no facilities at Collingwood for unloading the great number of cattle that had accumulated at that point on account of the strike, it became necessary to jump them out of the cars; after which they were driven to Painesville, a distance of twenty miles for yardage until the strike was over. It is claimed by appellee that this treatment greatly depreciated the weight as well as the value per pound of the cattle, and that this injury was aggravated by the cattle being huddled together in insufficient yards, in the hot sun, without shelter, and with an insufficient supply of either food or water at Painesville. It is shown, we think satisfactorily, that, although some of the strikers had up to that time been in the employ of the Lake Shore Company, on which road the trouble occurred, yet there were a sufficient number of engineers, conductors and brakemen ready and willing to

have taken the train in question through to Buffalo on the usual time, had they not been overpowered by superior forces from other roads. The manner in which this was done is best explained by Daniel M. Alvord, assistant yard-master of the Lake Shore road, who testified as follows:

"The men were called to take the train, and responded to the call, but they were prevented by the mob from taking the train out. They were early enough to take the train out. The mob refused to allow the men to go out, and refused to let the engines go. They made the engineers take the engines and put them in the engine house, and would not allow them to go into the yard to take the trains out at all. After they would not allow them to go out, we went to work and built pens, and went to unloading the hogs and sheep; and after the hogs and sheep were unloaded, we unloaded the cattle and started them to Painesville, where they could be fed, watered and taken care of. The mob of rioters spiked switches, pulled pins from between the cars, uncoupled them, ran cars off the tracks on the ends of the tracks, over the switches, took the hose off the engines and hid them, and used things up in general, so that they could not get an engine, or get to Painesville. I saw the engines after the hose was off, and the cars after the pins were out, and the cars off the track. I should think the average number of rioters was from 250 to 3,000. Some of them were employes and had been employes of the Lake Shore road, and some of them were not, and they refused to let anybody work for the Lake Shore road, and refused to work themselves. They said they would not allow anybody to go out of there; that if they did they would use violence. The engines which were to take the trains out in the afternoon of July 22, 1877, were in the Collingwood round-house, in charge of the foreman, until the mob took them out of his possession and control. A. T. Lawrence, caller, called the crew."

The extensive character of this strike, and the number as well as the efficiency of its forces and agencies are well described by J. W. Van Nolta, who testified as follows:

"I resided in Erie, Pennsylvania, July, 1877; was not connected with any railroad at the time. There was a strike of

railroad employes at that point, who organized themselves into a body called the strikers. It commenced July 22, and ended July 27 or 28. They had their regular meetings, and passed resolutions to compel the railroad companies to come to their terms. They numbered about 300, and were composed of men from the Philadelphia and Erie railroad, the Erie and Pittsburg railroad, and a few·from the L. S. & M. S. R. R. I was present at the organization, and was unanimously elected president. They resolved to strike, and to hold against any opposition at all hazards. The military was threatened; this exasperated the men; they armed themselves for any emergency, and determined to hold out till they accomplished their common object, by milder means at first, and, if necessary, to use force.

" This organization was in every State where railroads passed through, and also in Canada. They were very powerful; their object was to control wages when it came below what they thought was right, and for the control of other grievances. We acted in harmony with one another all over the country, and communicated through committees and by other means. It 'was understood we were not to go to work till we had received communications from the different places where men were on a strike that they were going to work. These committees were passing to and fro all the time while the strike lasted, stimulating the strikers and informing us what was going on at other points. They made their reports sometimes to the committees, and sometimes to the general meeting in the hall. It would have made them very indignant indeed, if the L. S. & M. R. R. Co. had acceded to the demands of the strikers, and attempted to remove trains while, the demands of the strikers upon other companies had not been complied with. The men were determined that no stock or freight trains should pass to or from Erie during the period of this strike. This resolution was passed by the entire body at their hall, and determined upon by the committees. I have every reason to believe that a stock train could not have passed through Erie in safety; that there would have been destruction of property and possibly loss of life. The strikers were armed with guns,

revolvers, and other weapons. They would first have used milder means, such as pulling pins, throwing switches, setting brakes, and requesting the men to leave the trains. If not complied with, they would have used force necessary to accomplish their objects. At times they were desperate, and hard to control; and I have every reason to believe that, had it not been for my extreme efforts and cautionary movements, we should have had trouble there. The military in general seemed to be in sympathy with the strikers, and many often expressed themselves to that effect to the strikers. The police seemed to be in harmony with them. There were other organizations from the different factories, who declared their sympathy and offered assistance in case of a collision. The strikers had full control of the motive power, cars, shops, etc., of the various lines of railway running into and through Erie. Not a single freight or stock train passed during the strike on any of the roads running into or through Erie."

This evidence is fully corroborated by that of other witnesses: There were, at that time, not less than one hundred and fifty cars, containing not less than three thousand cattle, at Collingwood, with not a wheel in motion to take them forward to their destination. That everybody was over awed by the strike, appears from the evidence of Juntgen on this point.

He testified: "I didn't see anything unusual at Collingwood. It seemed like Sunday. It was in fact Sunday. They were all dressed up; there were a good many more people there than usual; the hands seemed to be taking a holiday; I never saw a quieter crowd in my life—never; was there from Sunday noon till Tuesday noon. There wasn't a loud voice spoken. On Tuesday noon the employes opened the doors of the cars at Collingwood. They took the train loose, moved the train on the second track to the south, opened the doors of the cars, perhaps a dozen at once, and let the cattle jump out, and if they wouldn't go out, they would punch them out, and every animal that jumped out, almost, jumped on the rail of the other track. They gathered them in bunches, and about that time Couch and Reynolds requested us whether we would not go along with the cattle and see that they kept separate;

and said he, 'You can know the cattle better; know how they ought to be driven; and it will be an accommodation to us if you will go along. We will furnish you conveyances to Painesville,' which was twenty miles from Collingwood, where they had jumped out. We drove about a mile or two, when we came to a creek with quite a bank. The cattle were very dry; they had been standing two days in the cars on the side track, smothering there at Collingwood, without feed or water. When we got to the creek we couldn't manage the cattle; some ran one way, and some another, and jumped down the bank, twenty feet anyhow."

Can it be possible, we ask, that any railroad company, with such vast interests at stake, and with such vast responsibilities to be incurred, not only there, but for property in transit along its entire line, would submit to such delay unless compelled to do so by an overpowering force ? We are compelled to yield to the conclusion, forced upon us by the weight of the testimony, that the company was powerless in the premises, and was compelled for a time to submit to a superior force.

It is contended on the part of appellees, however, that these strikers were not public enemies, and that appellant was an insurer against everything but the act of God or the public enemy. This rule applies only to the safe delivery of the property at the point of destination, and in that case receives a very important modification in the case of live stock. I. & St. L. R. R. Co. v. Jury, 8 Bradwell, 160. But in respect to the time of delivery the rule is different. Hutchinson, in his work on Carriers (Sec. 330), says: " In this respect the common carrier stands on the same ground as other bailees, and may excuse delay in the delivery of goods, by accident or misfortune, although not inevitable, or produced by the act of God. All that can be required of him in such an emergency is that he shall exercise due care and diligence to guard against delay, and that, if it occur without his fault or negligence, he shall omit no reasonable effort to secure the safety of the goods." To the same effect are Parsons v. Hardy, 14 Wend. 216; Wibert v. R. R. Co. 2 Kern (12 N. Y. R.) 245; Thayer v. Burchard, 99 Mass. 521; Taylor v. G. N. R'y Co. 1 L. R. C. P.,

385; M. C. R. R. Co. v. Burrows, 33 Mich. 6; Hollowell Case, 65 Ind. 194; Story on Bailments, § 545. The same principle has been adopted by our own Supreme Court in G. & C. U. R. R. Co. v. Rae, 18 Ill. 488, and recognized in subsequent cases. Ill. Cent. R. R. Co. v. McClellan, 54 Ill. 70; M. C. R. R. Co. v. Curtis, 80 Ill. 324.

The rule thus established has but recently been applied to a case very much like the present (P. F. W. & C. R. R. Co. v. Hazen, 84 Ill. 36), in which the Supreme Court say: "For the delay resulting from the refusal of the employes of the company to do their duty, the company is undoubtedly responsible. For delay resulting solely from the lawless violence of men not in the employment of the company, the company is not responsible, even though the men whose violence caused the delay had, but a short time before, been employed by the company." In this case it appears that but a small portion of the strikers had been in the employment of the Lake Shore Company, and they had left their employment in order to join the strike. We feel controlled by this last case, because of its great similarity to the one in hand; and even if we did not find it so abundantly supported by authority and precedent, we should feel bound to yield to its authority.

It is contended, however, that irrespective of the damage caused by the delay, the evidence justifies the finding of the court on the ground of damage resulting from bad treatment of the cattle during the delay. We are unable to glean from the evidence what the cattle actually sold for, or where they were sold, and so are unable to tell whether or not any loss was sustained over and above the difference in price between July 24th and August 4th, and that which resulted from unusual shrinkage, which the proof shows to have been about 8,100 lbs. There are no propositions of law embraced in the record as "held" or "refused" by the court, and so we are without information as to the principles upon which the finding of the court was based. The difference in price, the unusual shrinkage and depreciation in value per pound, seem to have all been the result, so far as we can see, of the delay caused by the strikers, the company having done all that was apparently reasonably possible under the circumstances.

We can not yield our assent to the argument that appellant was bound to yield to the demands of the strikers in respect to their wages, rather than subject appellees to damage from delay, even though such strikers had been in their own employment up to the time of the strike. But the discussion of this point is unnecessary under the circumstances of this case, for it sufficiently appears that there were men on duty sufficient to have taken the train forward except for the strikers, and if every employe the Lake Shore road had, had been willing to work, there was still a force of strikers sufficiently strong to have overpowered them.

Believing as we do from the evidence that appellant has shown a good defense upon the merits to the largest part if not the whole of the several sums found by the court, and for which judgments were rendered, the judgments will be reversed and the causes remanded.

Reversed and remanded.