### WELLS *v.* ALEXANDRE *et al.*[1]

(*Superior Court of New York City, General Term.* April 15, 1889.)

SALE—REMEDIES OF SELLER.

The plaintiff wrote to the defendants, who owned and controlled certain steamers, saying that he "proposed" to furnish for the use of such steamers a certain grade of coal, at a named price, for a certain period of time. The proposal was accepted. *Held*, that the intention was that the coal should be delivered from time to time for the successive voyages of the steamers; that as the plaintiff could not know the amounts required, and the time when the coal would be needed, no obligation arose on his part to deliver the coal until notice thereof; and that as, without such obligation, there was no consideration for the promise of the defendants to take coal from the plaintiff, and the defendants did not give such notice, and were under no obligation, express or implied, to give it, their promise could not be enforced.

Appeal from special term.

Action by Margaret Wells against Francis Alexandre and others. Judgment was given for plaintiff, and defendants appeal.

Argued before SEDGWICK, C. J., and TRUAX and DUGRO, JJ.

*Carter, Rollins & Ledyard,* for appellants. *Wilcox, Adams & Macklin,* for respondent.

SEDGWICK, C. J. The complaint alleges that, at all times referred to in the complaint, the defendants were copartners, doing business in the city of New York, and were the proprietors of a line of steam-ships; that the plaintiff entered into an agreement with the defendants by which the plaintiff promised and agreed to furnish defendants, for the use of certain steam-ships then owned or operated by them, with such quantities of pea coal as might be required for said vessels during the year 1888, to be delivered along-side the same at pier 3, North river, in the city of New York, for the sum of $3.05 a ton, and in consideration thereof defendants promised and agreed to purchase from plaintiff, at said rate, all coal necessary for the use of the said steamships during said year; that ever since the date of said agreement said steamships have been making, and are still making, regular trips, and have required and used, and still require to use, large quantities of coal; that plaintiff has duly performed all the terms and conditions of said agreement on her part, and "has been and still is ready and willing to furnish coal in accordance with said agreement, and has duly notified defendants thereof, and duly tendered such coal to them, but the defendants have refused, and still refuse, to receive and pay for the same;" that by said refusal of defendants to perform the terms of their agreement plaintiff has been damaged in the sum, etc.

The answer, denying that they ever entered into the contract averred in the complaint, or any contract for the supplying of coal, as mentioned in the complaint, alleged, for a second and distinct defense, that on or before the 4th day of January, 1888, they were the owners or charterers and operators of the steam-ships City of Alexandria, City of Washington, and Manhattan, which steam-ships were used by them in the operation of a line running between the port of New York and ports in Mexico and Cuba. That on or about the 31st

[1] Reversing 3 N. Y. Supp. 122.

day of December, 1887, these defendants received from the said Joseph K. Wells, mentioned in said complaint, a letter, of which the following is a copy: "Dec. 31, 1887. Messrs. F. Alexandre & Sons, New York—Gents: We propose to furnish your steamers City of Alexandria, City of Washington, and Manhattan with strictly free-burning pea, delivered along-side pier 3, North river, for the year 1888, commencing January 1st, to December 31st, for the sum of three dollars and five cents ($3.05) per ton. We also agree to furnish any other steamers of your line with same coal, and at same price, at any time you wish. If, through any cause, we are unable to deliver pea coal, we will deliver you other sizes at an equitable adjustment of price. Yours, very respectfully, Jos. K. WELLS, Agt." That on the 4th day of January, 1888, these defendants answered said letter as follows: "New York, Jany. 4, 1888. Mr. Jos. K. Wells—Dear Sir: We beg to accept your offer of 31st ult., to furnish our steamers City of Alexandria, City of Washington, and Manhattan with strictly free-burning pea coal, delivered along-side pier 3, North river, for the year 1888, commencing Jan. 1st, for the sum of $3.05 per ton of 2,240 lbs. Also to furnish any other steamer of our line with same coal, at same price, if we wish it. If, through any cause, you are unable to deliver pea coal, you will deliver us other sizes, at an equitable adjustment of price. Yours, truly, F. ALEXANDRE & SONS,"—which answer was duly received by said Joseph K. Wells. That thereafter, and until the 25th day of June, 1888, these defendants purchased from the said Joseph K. Wells, as the agent of some person or persons to these defendants unknown, such quantities of coal as they required for use in the said steamships, and duly paid for the same. That on the said 25th day of June, 1888, these defendants, having determined to retire from the business of operating steam-ships, sold and conveyed unto the New York & Cuba Mail Steam-Ship Company all their steam-ship property, charters, and business, including all the right, title, and interest of these defendants in the three steamers above mentioned, and forthwith delivered the same to the said New York & Cuba Mail Steam-Ship Company, and ceased to operate the said steam-ships, or any of them. That since then these defendants have not required or used or purchased any coal for the operation of the said three steam-ships. That, as these defendants are informed and believe, the three steam-ships aforesaid are the steam-ships referred to in the complaint of the said plaintiff, and these defendants are advised and believe that they were under no obligation after the said 25th day of June, 1888, to receive from the said Joseph K. Wells, or any principal represented by him, any coal for use in said steam-ships, or any or either of them.

The plaintiff demurred to this defense, "on the ground that it is insufficient in law upon its face, in not stating facts sufficient to constitute a defense." The court below sustained the demurrer, with leave to defendants to amend the answer upon payment of costs. A judgment was entered on this decision, from which this appeal is taken by the defendants.

The counsel in the argument of the appeal have not raised any question of practice or of form, and have, in effect, made the matter to be decided the same as if on a trial it appeared that the only arrangement between the parties was such as would be proven by the existence of the facts alleged by the defense in the answer to have existed.

Attention is to be given, first, to ascertaining what were the relations of the parties, formed by the correspondence between them. The letter of plaintiff began, "We propose to furnish," etc. The answer of defendants was, "We beg to accept your offer," etc. As the latter was a reference to the former, and as, if it referred to something other than the former, there would be no *aggregatio mentium*, it must be taken that what was termed by defendants "your offer," meant "your proposal." The proposal was accepted. This means no more than that the proposal was assented to. As a proposal is necessarily unilateral, merely accepting it implies no engagement on the side of the

party to whom it is addressed beyond this: that the party addressed implies that he agrees to be bound by the terms of what is proposed. If there is not to be found, in those terms, a binding engagement, the party accepting is not bound. In *Justice* v. *Lang*, 42 N. Y. 493, it was held that a verbal promise to buy was sufficient consideration to support a written contract to sell. In the same case, on a later appeal, (52 N. Y. 323,) it was held that, under the circumstances of that case, whether such promise was made was a question for the jury. It was held that the testimony of the plaintiff that he "accepted the contract" would not necessarily show that he had made the verbal promise. Such testimony was equivocal. "In one sense he accepted it when he put the paper in his pocket and carried it away, and in another sense he may have accepted it as a voluntary promise or proposal to sell and deliver the arms, leaving it optional with him to accept or refuse them; and in still another sense by consenting to its terms, and agreeing to abide by and perform it, as the vendee named in it." In the case cited the memorandum signed by the defendant was, "We agree to deliver," etc. In the present case, the sense in which the acceptance was made is determined by the fact that it was only a proposal that was accepted. In *Butler* v. *Thomson*, 92 U. S. 412, the memorandum was signed by a broker, common to both parties. The form was, "Sold for A. B., to C. D.," certain goods, etc. The court held that this was a contract of the defendants to buy, because there could no sale without a buying, and therefore the word "sold" comprised the buying. This reasoning would not be applied to a "proposal," because that could occur without a purchase or a promise to purchase. In *Pordage* v. *Cole*, 1 Saund. 319*i*, the headnote is: "If it be agreed between A. and B. that B. shall pay A. a sum of money for his lands, etc., on a particular day, these words amount to a covenant by A. to convey the lands; for 'agreed' is the word of both."

What, then, were the terms proposed? The plaintiff was to "furnish" three steamers with coal for the year 1888. The subject-matter of the proposal, on a view favorable to plaintiff, was the supply of coal to the steamers for their successive voyages. It was not the obligation of the plaintiff that the coal should be "furnished" in one mass for the whole year. It could not have been meant that it was a privilege of plaintiff to deliver the whole on the 1st of January or the 31st of December. The intention at least was that there should be successive deliveries from time to time. As the plaintiff would not know the several amounts or the times when coal would be needed, it was to be implied that the obligation was to "furnish" coal, when notified by the defendants when and in what quantities coal was needed or to be delivered. This notification was therefore a condition of the creation of plaintiff's duty to furnish the coal. No such notification was given. Therefore there was no obligation on the part of plaintiff to furnish coal, and no consideration to defendants for any supposed promise on their part to "receive" the coal, unless it may be that there was an implied promise by defendants to notify plaintiff. There was no such express promise. Undoubtedly, if notification was given, the defendants would be liable for the amount specified in the notice, at the price named in the terms of the proposal. *L'Amoreux* v. *Gould*, 7 N. Y. 349; *Thayer* v. *Burchard*, 99 Mass. 508; *Railway Co.* v. *Witham*, L. R. 9 C. P. 16.

I do not think there is any implied promise by defendants to give the notice in question. *Thayer* v. *Burchard, supra; Bailey* v. *Austrian*, 19 Minn. 535, (Gil. 465;) *Burton* v. *Railway Co.*, 9 Welsb. H. & G. 507. The case is not different from that of a bare condition in a grant on which no action to perform the condition lies. In *Booth* v. *Mill Co.*, 74 N. Y. 15, the court did not hold that the ground of the implied promise was any condition contained in the instrument, but that the clauses in an agreement signed by defendant, that the defendants "are to proceed at once to make said rails," etc., could not be interpreted as conditions, "and evinced a promise to proceed at once," etc.

In *Iron Co.* v. *Railroad Co.*, 91 N. Y. 153, the court did not hold that a statement of a condition on which there was to be performance on plaintiff's part implied a promise by defendant to give the notice, but said that it appeared from other covenants that there was an intention manifested that the defendant should do certain things, in which the plaintiff acquired, by the contract, an interest. Upon that the court did not definitely hold that there was an implied promise to do the things or give the notice. It said: "Although the defendant does not in express terms undertake to do the act or give the notice which shall set the plaintiff in motion, a promise to do so, or at least a promise that the plaintiff shall have the building of the railway, if that enterprise is prosecuted by the defendant, is clearly to be implied from the covenants and stipulations which were inserted," etc. From this it would seem that the latter kind of promise was to be implied, there being some doubt as to the former kind of promise. That case, as presented, did not make it necessary to determine what would be the measure of damages in the case of a promise not to give work to another unaccompanied with a valid promise to give it to the plaintiff.

In this case there is only the condition, and nothing else, to show an implied promise. The only thing in which the plaintiff could have the interest pointed at in *Iron Co.* v. *Railroad Co.*, *supra*, was the payment of purchase price, and this could not affect the nature of the obligation upon which that price was to be paid. In *Quick* v. *Wheeler*, 78 N. Y. 302, the agreement by defendant was to pay the plaintiff 4½ cents per foot, for from 6,000 to 15,000 feet of timber of same kind, etc., and delivered at the place aforesaid, during the winter, etc. The agreement was signed by both parties. The court said: "There was no mutuality. There was not the consideration which mutual promises give a contract. The plaintiff did not bind himself to sell and deliver the tie timber. Hence this contract can be treated only as a written offer on the part of the defendant to take and pay for the timber upon the terms stated." In *Jones* v. *Kent*, 80 N. Y. 585, the obligation of the vendee to pay the consideration stipulated for by the vendor was made the ground of the implied promise that the court held was made by the vendee; it being the case of property delivered to vendee.

As notice or demand was not given or made, my opinion is that the plaintiff was not held to furnish any coal, and that defendants were not held to pay for any coal, that had not in fact been demanded or received. By the answer, it appeared that the defendants had sold the steamers, and did not need any coal for them after June 25, 1888. In view of the conclusion that the obligation of the defendants to pay depended upon whether they had given a notice or made a request or demand, it is not necessary to examine a matter which would be only an examination of the reason why the defendants ceased to give orders. The counsel, however, have given a part of their argument to this subject in a certain way. One side took the position that, as the defendants needed no coal for the steamers after they were sold, they were absolved from the contract; or, rather, that the contract did not contemplate the furnishing any coal after that time. If this is correct, it would be because the contemplation of the parties was that such coal should be furnished as the defendants needed for the steamers. The other side took the position that, whether the defendants needed the coal for the steamers or not, they were bound to take as much as the plaintiff was bound to furnish, and that was as much as the steamers should be supplied with, to enable them to make the regular trips of 1888. The question is, again, what are the implications of the contract? Parsons says, (2 Pars. Cont. bottom p. 646, top p. 516:) "The general ground of a legal implication is that the parties to the contract would have expressed that which the law implies, had they thought of it, or had they not supposed it was unnecessary to speak of it, because the law provided for it." In *Russell* v. *Allerton*, 108 N. Y. 292, 15 N. E. Rep. 391, in the contract to be con-

strued was a clause, "charterers to approve the ventilation." It was necessary to determine whether they might make or not make an approval at their pleasure. The court held that they could not. It was said: "To give the words in question" that meaning "is to place the plaintiffs, in a matter purely of business, wholly at the mercy of others with whom they were contracting. Could the plaintiffs have intended any such result, or could the defendant have expected such action on the part of the plaintiffs?" It was held that under the clause the charterers were bound to approve such devices as would secure ventilation to a reasonably sufficient extent, under the circumstances.

It seems that parties about to make an arrangement as to coaling vessels for a year would not think that the owner would keep vessels for the sake of having them coaled, or that he would need coal after he had sold them. There would not be among business men the idea that coal to be bought, to be used by the buyer upon vessels, would be needed or would be bought for vessels after they had been sold. I therefore think that by the language used the parties to this arrangement did not mean that the plaintiff should "furnish" coal to the vessels after the defendants had sold them, and needed no more coal for them. Of course, a person can buy more coal than he will need for any specified purpose, and a contract for that is valid. He is not held to the purchase until a construction of the contract shows that such was its meaning. The language of this contract is so undefined, so uncertain, that construction is called for, and that is that the steamers were to be furnished, so long as the steamers remained in the circumstances that existed at the time of the making of the arrangement. The important circumstance now referred to is that the steamers were owned and managed by the defendants. The case of *Whelan* v. *Clock Co.*, 97 N. Y. 295, follows the case of *Niblo* v. *Binsse*,* 40 N. Y. 476. Niblo's assignor had contracted to put certain heating apparatus into a house. Before the work was done the house was burned. The plaintiff sued for the work already done. The defense was that the contractor had failed to do all the work he contracted to. This was held to be no defense, because, as the court decided, the contractor's failure was caused by a default of the defendant. "If one party agrees with another to do work upon his house or other building, the law implies that the employer is to have the building in existence upon which the work contracted for may be done." In the cited case there was no doubt as to the extent of work the contractor agreed to do. In the present case it has been said that the true interpretation of the contract did not call upon the plaintiff to deliver, or the defendants to buy, coal for the ships when they ceased to be under the ownership or management of the defendants. In *Tompkins* v. *Dudley*, 25 N. Y. 272, it was held that if by contract the completion of a house is a condition precedent of the payment of money as compensation there is no obligation to pay the money, unless the house be in fact completed; and, though the house was burned, the condition was not performed. In *Booth* v. *Rolling-Mill Co.*, 60 N. Y. 490, it was held that, if a party unqualifiedly contracts to deliver 400 tons of rails, he must perform his contract, or be liable for a non-performance, although his rolling mill, in which he would make the rails, be burned. In *Dexter* v. *Norton*, 47 N. Y. 62, it was held that where specific property is the subject of a contract of sale, with future delivery, title not vesting in the vendee, and before the day of delivery it is burned without fault on the part of vendor, the latter is not bound to a delivery or liable in damages. The reason for this is that the obligation to deliver is subject to an implied condition that the property sold remains in existence. There is no implied contract by the vendor that it shall exist. I am of opinion that the contracts of the parties did not imply that the coal to be "furnished" to the steamers was such coal as would be needed for them, if they went into other hands than those of defendants. The judgment below should be reversed, with costs to abide event, and defendants should have judgment on the demurrer, with costs. All concur.